IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

UNITED STATES OF AMERICA                                                    PLAINTIFF

v.                         Case No. 4:21-cr-00214-KGB

ANGELO MARCEL GLADNEY                                                     DEFENDANT

## ORDER

Pending is defendant Angelo Marcel Gladney's motion to suppress (Dkt. No. 51). Mr. Gladney seeks to suppress "any and all statements made by Mr. Gladney, as well as the seized contraband and cell phones," based on Mr. Gladney's contention that the traffic stop of the vehicle in which Mr. Gladney was a passenger "was not valid at its inception" and his contention that the Arkansas State Trooper unlawfully "abandoned the traffic investigation and expanded the scope and length of the roadside detention" in violation of *Rodriguez v. United States*, 575 U.S. 348, 350–51 (2015). The United States of America ("Government") responded in opposition to the motion (Dkt. No. 53). Mr. Gladney then replied to the Government's response (Dkt. No. 57). The Court conducted a hearing on the motion on July 7, 2025, at which Mr. Gladney, his counsel, and counsel for the Government were present. The Court received evidence and testimony, and heard argument, at the hearing. For the following reasons, the Court denies the motion to suppress (Dkt. No. 51).

   I.   **Factual Background**

At the hearing on the motion to suppress, Drug Enforcement Agency ("DEA") Special Agent Josh Laster took the stand, was sworn, and testified as follows. Agent Laster has worked with the DEA for 13 years and, prior to that, worked as a law enforcement officer for seven years. He testified that, in regard to this case, he received information from Kentucky Task Force Officer

Wesley Troutman out of Louisville, Kentucky, who also is a detective with the Louisville Metro Police Department. The Kentucky task officers received information from a confidential source that Mr. Gladney would be traveling with an unknown female in a rental vehicle, unknown make and model, from Houston, Texas, to Louisville, Kentucky, transporting cocaine and MDMA sometime in mid- to late-July 2021. Agent Laster was provided with this information and a photo of Mr. Gladney that Kentucky task force officers confirmed with the confidential source was the individual known to the confidential source as the individual who would be traveling from Houston, Texas, to Louisville, Kentucky, transporting narcotics.

Based on the investigation, the Kentucky task force officers obtained a "Trap/Trace/Ping Order" for the telephone number believed to be used by Mr. Gladney ("Ping Warrant") (Government Ex. 2). Agent Laster testified the Ping Warrant was obtained prior to the traffic stop that is the subject of Mr. Gladney's motion to suppress. Further, Task Force Officer Troutman provided the proof necessary for the Ping Warrant.

Agent Laster and a task force officer set up surveillance in Saline County, Arkansas, on or about July 21, 2021, based on information provided from Task Force Officer Troutman, with telephone providers providing GPS coordinates in response to the Ping Warrant approximately every ten to 15 minutes as Mr. Gladney traveled. Agent Laster testified that the GPS coordinates showed generally travel on Interstate 30 and then Interstate 40 through Arkansas. Based on the GPS coordinates, it appeared that Mr. Gladney was stopped for a period in or around Palestine, Arkansas. Agent Laster and other law enforcement officers attempted to locate Mr. Gladney and the stopped vehicle but were unsuccessful.

Based on the GPS coordinates, it appeared that Mr. Gladney continued his travel East on Interstate 40. Agent Laster continued his surveillance and testified that a passenger vehicle driven

by a black female was the only passenger vehicle he observed on Interstate 40, along with tractor trailers, as he was receiving GPS coordinates from the Ping Warrant in that area ("Passenger Vehicle"). Further, Agent Laster testified that he drove past the Passenger Vehicle to see if any other passenger vehicles were ahead as potential sources of the GPS coordinates from the Ping Warrant. Agent Laster observed no other passenger vehicles in the area.

According to Agent Laster, the Arkansas State Police ("ASP") were provided a photo of Mr. Gladney; were informed that Mr. Gladney would travel in a rental vehicle of an unknown make and model, with an unknown female as a driver; were told that Mr. Gladney would travel from Houston, Texas, to Louisville, Kentucky, transporting cocaine and MDMA; and were later provided with the license plate information, make, and model of the Passenger Vehicle obtained by Agent Laster's surveillance.

ASP Trooper Arnold confirmed from the license plate information, make, and model of the Passenger Vehicle that it was a rental. Agent Laster coordinated with Trooper Arnold to conduct a traffic stop of the Passenger Vehicle.

Trooper Arnold initiated his dash camera but not his lights and sirens as he traveled East on Interstate 40. The Government introduced the video of the dash camera for the stop (Government's Ex. 1). The monitor of Trooper Arnold's dash camera indicated on the opening screen that his speed at the start was 126 miles per hour. The dash camera video proceeds to show Trooper Arnold approach the Passenger Vehicle from behind, and the Passenger Vehicle change lanes without signaling.

Trooper Arnold initiated a traffic stop of the Passenger Vehicle, approached the Passenger Vehicle from the passenger side, and put his head up to or into the passenger side window. According to Trooper Arnold, a black female was the driver, a young child was in the back seat,

3

and an individual who appeared to be Mr. Gladney was reclined in the passenger seat sleeping or feigning sleep. Trooper Arnold asked the black female driver to exit the Passenger Vehicle and step to the rear of the Passenger Vehicle. Trooper Arnold asked for identification, and the black female driver provided both a military and state identification. She was identified as Ebony Russell. Trooper Arnold asked Ms. Russell if she had any weapons on her. He asked where she was headed, and she responded Louisville, Kentucky. She stated that Mr. Gladney was her friend named "Daniel." Trooper Arnold ask Ms. Russell if she was in the military, based on the identification she provided. Trooper Arnold asked Ms. Russell if she had ever been arrested. Trooper Arnold asked Ms. Russell what she did for work. Trooper Arnold asked if there was anything illegal in the vehicle. Trooper Arnold asked who rented the vehicle, and Ms. Russell said a friend of Mr. Gladney's rented the vehicle because neither she nor Mr. Gladney had the required credit card to do so. Trooper Arnold confirmed with Ms. Russell the destination and purpose of their trip. After again asking if there was anything illegal in the vehicle, Trooper Arnold asked Ms. Russell for consent to search the vehicle. In response, Ms. Russell told Trooper Arnold he would have to ask Mr. Gladney. She also asked if there was probable cause or a reason Trooper Arnold needed to search the vehicle.

      Trooper Arnold asked Ms. Russell to remain outside of the vehicle at the rear, and he approached Mr. Gladney in the passenger seat of the vehicle. Trooper Arnold asked Mr. Gladney for his name, and Mr. Gladney claimed he was "David." Trooper Arnold asked Mr. Gladney for identification and was provided a Florida identification card in the name of "David Brown." Trooper Arnold asked Mr. Gladney where they were traveling and the purpose of their trip. Trooper Arnold also asked Mr. Gladney if there was anything illegal in the vehicle, confirmed that

a friend of Mr. Gladney's had rented the vehicle, and asked Mr. Gladney for consent to search. Mr. Gladney consented to search.

Trooper Arnold then returned to Ms. Russell and confirmed with her Mr. Gladney's consent and asked for, and received, Ms. Russell's consent to search the vehicle. Trooper Arnold removed the child and Mr. Gladney from the vehicle, after checking for weapons and asking Mr. Gladney to leave his phone.

Trooper Arnold searched the vehicle and discovered approximately 29.5 pounds of cocaine and approximately 1.11 pounds of ecstasy. Trooper Arnold is seen on the dash camera approaching Ms. Russell and Mr. Gladney after the search. Mr. Gladney was placed under arrest by Trooper Arnold.

## II.     Legal Standard

"The exclusionary rule is a deterrent sanction that bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation." *United States v. Reed*, 978 F.3d 538, 541 (8th Cir. 2020) (quoting *Davis v. United States*, 564 U.S. 229, 232 (2011)). "The rule applies to deter future unlawful police conduct." *Id.* It is best understood as a judicially created supplement to the text of the Fourth Amendment, which is silent as to its enforcement. *Davis*, 564 U.S. at 231.

The Fourth Amendment itself protects "[t]he right of the people to be secure . . . against unreasonable searches and seizures." U.S. Const. amend. IV. "A traffic stop is a reasonable seizure if it is supported by probable cause or reasonable suspicion of criminal activity." *United States v. Brown*, 60 F.4th 1179, 1182 (8th Cir.), *cert. denied*, 143 S. Ct. 2623 (2023).

Reasonable suspicion is "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Id.* (quoting *Kansas v. Glover*, 589 U.S. 376, 380 (2020)).

5

"The standard depends on the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* (quoting *Glover*, 589 U.S. at 380). Law enforcement officers are allowed "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Id.* (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). Courts look to the "totality of the circumstances" in determining whether reasonable suspicion existed. *Id.* "Because it is a 'less demanding' standard, 'reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause.'" *Kansas v. Glover*, 589 U.S. 376, 380 (2020) (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)). Moreover, because the Fourth Amendment carries an objective standard, reasonable suspicion is "not dependent on an [] officer's subjective belief." *See United States v. Torres-Lona*, 491 F.3d 750, 756 (8th Cir. 2007).

### III. Discussion

#### A. The Initial Stop

"A traffic stop is a seizure, so it must be supported by reasonable suspicion or probable cause." *United States v. Maurstad*, 35 F.4th 1139, 1143 (8th Cir. 2022). Any traffic violation, no matter how minor, provides probable cause for a traffic stop. *United States v. Rose*, 124 F.4th 1101, 1105 (8th Cir. 2025). It is undisputed from the video of Trooper Arnold's dash camera that Ms. Russell did not signal prior to changing lanes. This was a violation of Arkansas law. Ark. Code Ann. § 27-51-403(a) and (b). This provided probable cause for the stop.

That Trooper Arnold coordinated the stop with Agent Laster does not change this. A stop based on a traffic violation is not "rendered invalid by the fact that 'it was a mere pretext for a narcotics search.'" *United States v. Williams*, 429 F.3d 767, 771 (8th Cir. 2005) (quoting *Whren*

*v. United States*, 517 U.S. 806, 812-13 (1996)).  Further, although Mr. Gladney may have abandoned this argument at the hearing on the motion to suppress, the Court makes clear that it rejects based on the law cited and the facts of this case any argument that the stop was invalid because Trooper Arnold in some way provoked the violation by driving behind Ms. Russell at a high rate of speed.

### B. The Duration Of The Stop

The Court acknowledges that a traffic stop justified only by a police-observed traffic violation "'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Rodriguez v. United States*, 575 U.S. 348, 350–51 (2015) (alterations in original) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). Although an officer "may conduct certain unrelated checks during an otherwise lawful traffic stop . . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 355.  Tasks for which an officer may reasonably extend a traffic stop include "running a computerized check of the vehicle's registration and insurance; running a similar check of the occupants' identification documents and criminal histories; preparing the traffic citation or warning; and asking the occupants about their 'destination, route, and purpose.'" *United States v. Murillo-Salgado*, 854 F.3d 407, 415 (8th Cir. 2017) (quoting *United States v. Peralez*, 526 F.3d 1115, 1119 (8th Cir. 2008), *overruled abrogated on other grounds by Rodriguez*, 575 U.S. at 348).  The ultimate constitutional reasonableness of a traffic stop depends on its objective reasonableness, not the "actual motivations of the individual officers involved." *Whren*, 517 U.S. at 813.

The information known to the other officers is imputed to Trooper Arnold through the collective knowledge doctrine, as Trooper Arnold communicated with Agent Laster regarding a

traffic stop on the Passenger Vehicle. *See United States v. Williams*, 429 F.3d 767, 771–72 (8th Cir. 2004) (holding that under the collective knowledge doctrine, knowledge of the other officers was imputed to an officer who received a radio request to stop the vehicle). "A confidential informant's tip may support a reasonable suspicion if it has sufficient indicia of reliability, *United States v. Hill*, 91 F.3d 1064, 1069 (8th Cir. 1996), such as the informant's track record as a reliable source or independent corroboration of the tip, *see United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993)." *United States v. Manes*, 603 F.3d 451, 456 (8th Cir. 2010).

According to Trooper Arnold, before he stopped the Passenger Vehicle, the ASP received a photo of Mr. Gladney; were informed that Mr. Gladney may be traveling in a rental vehicle of an unknown make and model, with an unknown female as a driver; were told Mr. Gladney may be traveling from Houston, Texas, to Louisville, Kentucky, transporting cocaine and MDMA; and were later provided with the license plate information, make, and model of the Passenger Vehicle obtained by Agent Laster's surveillance. Based on the license plate, make, and model provided by Agent Laster and run through the ASP, before he stopped the Passenger Vehicle, Trooper Arnold knew the Passenger Vehicle was a rented vehicle.

Immediately after the initial stop, Trooper Arnold approached the passenger side of the Passenger Vehicle and observed the driver who was a female, the minor passenger, and an individual who appeared to be Mr. Gladney in the passenger seat reclined and sleeping or feigning sleep in the Passenger Vehicle; Trooper Arnold had previously been provided with a photograph of Mr. Gladney by Agent Laster. Trooper Arnold then asked the female driver, Ms. Russell, to step out of the car, and during his questioning of her, Trooper Arnold learned that Ms. Russell was traveling from Houston, Texas, to Louisville, Kentucky. Trooper Arnold also learned in

questioning Ms. Russell that the vehicle was rented by a third person, not Ms. Russell or Mr. Gladney.

Through his training and experience, Trooper Arnold knew that drug couriers regularly utilize rented vehicles to transport narcotics and that Houston, Texas, is a source city for narcotics. Trooper Arnold's observations and the information he learned during the stop corroborated the information provided to him by Agent Laster from the confidential informant.

When the Court considers the totality of the circumstances, the Court determines that, at the time Trooper Arnold asked Ms. Russell for permission to search the Passenger Vehicle, reasonable suspicion existed.

In response to a request by Trooper Arnold to search the vehicle, Ms. Russell referred Trooper Arnold to Mr. Gladney for an answer to the question. During his exchange with Mr. Gladney, Trooper Arnold learned that, although Ms. Russell identified him as "Daniel," Mr. Gladney produced a Florida identification in the name of "David Brown." Mr. Gladney confirmed the route was Houston, Texas, to Louisville, Kentucky. For these reasons, when Trooper Arnold asked Mr. Gladney for permission to search the Passenger Vehicle, considering the totality of the circumstances, reasonable suspicion existed.

When asked, Mr. Gladney consented to the search. When asked again and informed of Mr. Gladney's consent, Ms. Russell also consented to the search.

To the extent Mr. Gladney argues that dissemination of GPS coordinates from the Ping Warrant violated the terms of the Ping Warrant, the Court rejects the argument (Government Ex. 2). Further, to the extent Mr. Gladney attempts to challenge application of the collective knowledge doctrine on these facts, the Court rejects the argument. This case involves the search of a vehicle, and there is sufficient evidence before this Court that Kentucky Task Force Officer

9

Troutman, Agent Laster, and Trooper Arnold had some degree of communication and functioned as a search team.  *See United States v. Gillette,* 245 F.3d 1032, 1034 (8th Cir. 2001), *cert. denied,* 534 U.S. 982 (2001) (determining that the validity of a search may be based on the collective knowledge of all of the law enforcement officers involved in an investigation if some degree of communication exists between them, requiring some degree of communication to distinguish between officers functioning as a search team and officer acting as independent actors who merely happen to be investigating the same subject).  The Court rejects any suggestion that, under controlling law on the record evidence before the Court, any agent, officer, or trooper acted in bad faith when conducting this search (Dkt. No. 57, at 10).

### C.    Alternatively, The Stop Was A Permissible Investigative Stop

Even if the initial traffic stop was not supported by probable cause provided by the witnessed traffic violation, the Court concludes the stop was a permissible investigative stop supported by reasonable suspicion.  "'A police officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'"  *United States v. Collins*, 883 F.3d 1029, 1031–32 (8th Cir. 2018) (quoting *United States v. Fields*, 832 F.3d 831, 834 (8th Cir. 2016)).  "'This includes the right to 'briefly stop a moving automobile to investigate a reasonable suspicion that its occupants are involved in criminal activity.'"  *Id.* at 1032 (quoting *United States v. Winters*, 491 F.3d 918, 921 (8th Cir. 2007)).  "'When a team of law enforcement officers is involved in an investigation, the issue is whether all the information known to the team provided 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant' the investigative stop."  *Id.*  The Court concludes that, even if the initial traffic stop was not supported by probable cause provided by the witnessed traffic violation, Trooper Arnold had

reasonable suspicion to conduct a brief, investigatory stop of the Passenger Vehicle for the reasons explained in this Order.

### IV. Conclusion

For the foregoing reasons, the Court denies Mr. Gladney's motion to suppress (Dkt. No. 51).

It is so ordered this 8th day of July, 2025.

_____
Kristine G. Baker
Chief United States District Judge